**JUDGE CARTER**

Anthony Carabba, Jr.
Carabba Law Firm P.C.
85 Worth Street, 3rd Floor
New York, New York 10013
212.430.6400

# 13 CV 4274

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

CHRISTOPHER OATES,

                    Plaintiff,

      -against-

BANK HAPOALIM B.M., HAPOALIM U.S.A.
HOLDING COMPANY, INC., SARA HAZAN,
STACY DAVIS, and ALEX FRIED,

                    Defendants.

--------------------------------------------------------------X

ECF Case

Civil Action No.

**COMPLAINT**
**JURY TRIAL DEMANDED**

RECEIVED JUN 20 2013

      Plaintiff Christopher Oates, by and through his attorneys, Carabba Law Firm P.C., alleges and complains as follows:

## INTRODUCTION

    1.      Plaintiff, who is gay and who suffers from HIV, brings this action against Defendants Bank Hapoalim B.M. and Hapoalim U.S.A. Holding Company, Inc. (together, the "Bank"), as well as Sara Hazan, Stacy Davis, and Alex Fried (collectively, "Defendants"), due to Defendants' unabashed harassment, discrimination, and retaliation against him due to his sexual orientation, his disability, and because he needed to take medical leave. Specifically, Plaintiff brings claims for unlawful interference with the exercise of his rights, and discrimination and retaliation against him for such exercise, under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); discrimination based on perceived and actual disability discrimination, as well as sexual orientation discrimination, under the New York State Human Rights Law, N.Y.

Exec. Law § 290 *et seq.* ("Human Rights Law") and the New York City Administrative Code § 8-101 *et seq.* ("City Law"); and intentional infliction of emotional distress, among others.

2.       Plaintiff seeks compensatory and punitive damages, liquidated damages, attorneys' fees, and other appropriate relief pursuant to the FMLA, Human Rights Law, and City Law.

## JURISDICTION AND VENUE

3.       This Court has jurisdiction over Plaintiff's FMLA claims pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.

4.       This Court may assert supplemental jurisdiction over Plaintiff's Human Rights Law and City Law claims as authorized by 28 U.S.C. § 1367(a).

5.       Venue is proper within this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this District.

## THE PARTIES

6.       Plaintiff Christopher Oates ("Plaintiff") resides in the State of New York, County of New York, and is a citizen of the United States.  Plaintiff is a 33-year-old homosexual, who has the human immunodeficiency virus ("HIV").

7.       Upon information and belief, Defendant Bank Hapoalim B.M. is a corporation organized and existing under the laws of Israel, with its principal place of business in Tel Aviv, Israel.  It maintains a branch office for the transaction of business in the State of New York at 1177 Avenue of the Americas, New York, New York 10036.  Plaintiff was employed at this location.

8.      Upon information and belief, Defendant Hapoalim U.S.A. Holding Company, Inc. is a corporation organized and existing under the laws of New York, with its principal place of business at 1177 Avenue of the Americas, New York, New York 10036.  Plaintiff was employed at this location.

9.      Upon information and belief, Defendant Sara Hazan, a Bank employee, is a resident of the State of New York.  At all times relevant to this action, Hazan was a deposit services assistant and Plaintiff's co-worker.

10.     Upon information and belief, Defendant Davis, a Bank employee, is a resident of the State of New York.  At all times relevant to this action, Davis was an Assistant Vice President of Deposit Services and Plaintiff's direct supervisor in the Deposit Services Department.

11.     Upon information and belief, Defendant Fried, a Bank employee, is a resident of the State of New York.  At all times relevant to this action, Fried was Vice President of Money Transfer and Cash Management Services and Plaintiff's direct supervisor when he worked in the money transfer room.

12.     At all times relevant to this action, Plaintiff was an "eligible employee" of the Bank within the meaning of 29 U.S.C. § 2611(2) in that Plaintiff was employed by the Bank for years prior to the events underlying this lawsuit; was employed by the Bank for at least 1,250 hours during the 12 month period immediately preceding the commencement of the leave which underlies this lawsuit; the Bank employed more than 50 employees within a 75 mile radius of where Plaintiff worked.

13.     At all times relevant to this action, Plaintiff suffered from a serious health condition within the meaning of 29 U.S.C. § 2611(11), and suffered from a disability within the

meaning of the Human Rights Law § 292(21) and the City Law § 8-102(16).  Specifically, Plaintiff suffers from HIV, a condition that, among other things, causes progressive failure of the immune system provoking episodes of incapacity and requiring periodic doctor visits for treatments that continue over extended periods of time.

14.     At all times relevant to this action, the Bank was an employer within the meaning of 29 U.S.C. § 2611(4) because it was engaged in an industry affecting interstate commerce and employed more than 50 employees for each working day during each of 20 or more calendar workweeks in the current and preceding calendar year.

15.     At all times relevant to this action, the Bank was an employer within the meaning of the Human Rights Law § 292(5) and the City Law § 8-102(5).

16.     At all times relevant to this action, Davis was an employer within the meaning of 29 U.S.C. § 2611(4) because she acted, directly and indirectly, in the interest of the Bank to Plaintiff and other Bank employees.

17.     At all times relevant to this action, Davis was an employer within the meaning of the Human Rights Law § 292(5) and the City Law § 8-102(5).

18.     At all times relevant to this action, Fried was an employer within the meaning of 29 U.S.C. § 2611(4) because he acted, directly and indirectly, in the interest of the Bank to Plaintiff and other Bank employees.

19.     At all times relevant to this action, Fried was an employer within the meaning of the Human Rights Law § 292(5) and the City Law § 8-102(5).

20.     Prior to commencing this action, Plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Corporation Counsel.

**STATEMENT OF FACTS**

21.     On or about July 14, 2010, the Bank hired Plaintiff as a temporary worker through Core Staffing Services to scan documents and answer phones in the Bank's Deposit Services Department.  At the time, Plaintiff was in a committed same-sex relationship, but chose to not reveal his sexual orientation to his co-workers.

22.     From the onset, Plaintiff observed that the Bank had a deep-rooted, discriminatory corporate culture.

23.     When Plaintiff first began, Carol Foster ("Foster"), a deposit services assistant at the Bank, told Plaintiff that the Bank created the temporary position he occupied to replace Belita Lustgarten ("Lustgarten").  Foster told Plaintiff that Lustgarten accused the Bank of age discrimination and was forced to resign as a condition of a legal settlement.

24.     Foster explained that Plaintiff was the third temporary employee to occupy the position because Hazan, a deposit services assistant and long-time employee of the Bank, harassed the previous employees because they were gay, causing them to quit.  Foster stated that one of the temporary employees was openly upset by Hazan's discriminatory behavior against gays.  Making matters worse, Foster herself ridiculed gays by using exaggerated body movements stereotypically associated with gay men.

25.     Foster also described an incident where Hazan called one of the temporary employees a "terrorist" because of his Middle Eastern descent.

26.     In addition, Foster made her own discriminatory remarks.  Within a month of becoming a temporary employee, Plaintiff heard Foster use the word "faggot" during a conversation with Leonard Thompson, a mail room clerk.

27.     When he heard the word faggot used in the workplace, Plaintiff immediately complained to Donna Hall, Vice President of Human Resources ("HR").  In response, Hall told Plaintiff that he was "being too sensitive."  Hall explained that since Foster was in her sixties, her use of the word faggot was a "generational issue."  Nevertheless, she said she would host an office-wide sensitivity training at a later date.

28.     Despite his uncomfortable and discriminatory work environment, Plaintiff excelled and took on more job responsibilities, receiving a raise from $12 per hour to $13.50 per hour.  Because Plaintiff performed at an exemplary level, in or about November 2010, the Bank hired him as a full-time employee, becoming a deposit services assistant.

***Discrimination is the Corporate Culture***

29.     After Plaintiff was hired as a full-time employee, he felt that he had more job security and began to speak more freely about his personal life.

30.     Around the same time, the Bank hosted sensitivity training.  During the training, the Bank played a short video containing bad actors portraying strange workplace scenes, such as employees buying an older co-worker Depends undergarments as a gift.  Of course, no one took the "training" seriously and various employees openly mocked the video presentation, which seemed only to reinforce the Bank's discriminatory corporate culture.

31.     Each day, it became more apparent that the sensitivity training had no positive impact.  Daily conversations and interactions continued to be permeated with discriminatory remarks.  On many occasions, Plaintiff heard his co-workers, such as Hazan, make openly discriminatory comments.

32.     For example, in or about July 2011, Jing Qu ("Qu"), an Asian female on the Bank's Information Technology Help Desk, helped fix Hazan's computer.  When Hazan

restarted her computer, she noticed something missing from her desktop.  She became extremely agitated, blamed Qu for the problem, yelling, "[w]here is that girl, that ching chong ding dong or whatever her name is?"

33.     Hazan's discriminatory remarks continued.  In or about April 2012, Plaintiff met with Luis Cardona, Assistant Treasurer; John Motto ("Motto"), Vice President of Deposit Services and Office Services; and Hazan.  At this meeting, they discussed Stacy Kelly-Martin, a temporary employee in the Deposit Services Department who is of Jamaican descent.  Hazan complained about Kelly-Martin, and told Motto to "not hire another black – they all stick together and cover for each other."

34.     Plaintiff immediately reported this openly racist remark to Modica, Senior Vice President of Operations, who oversaw the Deposit Services Department.  Upon information and belief, Kelly-Martin also made several complaints to Modica and HR about Hazan's discriminatory behavior; the Bank did nothing in response to these complaints.  In or about July 2012, Kelly-Martin resigned.

35.     Foster also made openly discriminatory remarks.  On or about August 2, 2012, she told Bibi Kalanich, a temporary employee in Deposit Services Department, that she disapproved of interracial couples.  Foster stated "O.J. [Simpson] don't get no sympathy from black folks after he married that white one [Nicole Brown]."  Kalanich agreed, asking, "[w]hy don't people just marry their own kind?"

36.     In addition to racist comments, Bank employees also used openly homophobic slurs.  In or about late October 2011, Plaintiff overheard Motto tell Cardona to not to "be a fag." Realizing Plaintiff heard this, Motto apologized for the derogatory comment.

7

37.     Although Plaintiff was offended by the unlawful discriminatory behavior, he persevered and continued to work hard.  In or about February 2011, he received a perfect first performance evaluation from his direct supervisor, Davis, Associate Vice President of Deposit Services.  In each review category, Plaintiff received all "good" ratings on a three-tier scale, with "good" being the best possible option.

***Plaintiff Announces He is Gay and is Harassed Because of his Sexual Orientation***

38.     On or about June 27, 2011, Plaintiff announced his engagement to his boyfriend, Michael, to various employees, including Davis, Motto, Foster and Cardona.  Plaintiff did not tell Hazan because he felt uncomfortable given her prior discriminatory remarks.  Hazan, however, learned of Plaintiff's engagement news through other employees.

39.     Plaintiff was aware that the Bank offered one week of additional paid vacation time to employees who got married (this policy was communicated to him at an in-person benefits orientation meeting in or about December 2010).  Accordingly, he requested time off for July 25, 2011 (the day he believed same-sex marriages would be performed in New York), and for the remainder of that week.

40.     HR denied Plaintiff's request for time off, claiming that the policy was available only for those employed full-time for at least a year.  At this time, Plaintiff had worked at the Bank for over a year, but four months as a temporary employee.

41.     Modica, however, told Plaintiff that exceptions had been made in the past.  Upon information and belief, Motto approved Andy Penate ("Penate"), a deposit services assistant who married his wife about two years prior, to receive a paid week off for his wedding.  At the time, Penate was a full-time employee for less than a year at the time of his marriage.  Similar to

Plaintiff, Penate worked at the Bank for over a year, but half of that time was as a temporary employee.

42.     Modica advised Plaintiff to seek special permission from Motto.  Motto promised to "look into it," but never did.

43.     Around the same time, Hazan began her anti-gay campaign against Plaintiff, just as she did to his predecessors.

44.     On or about August 24, 2011, Plaintiff learned from a co-worker that Hazan gave him the finger behind his back.  Plaintiff confronted Hazan about the incident, threatening to report her if she did not stop.  In response, Hazan laughed at Plaintiff, and accused him of being hostile towards her.

45.     Further, Hazan belittled and embarrassed Plaintiff in front of his co-workers because of his sexual orientation.  Because Hazan was a long-term employee of the Bank, she exerted much influence.  She ordered many of them to ignore Plaintiff, telling them that he was "stupid" and "did not know anything."   She would also glare at Plaintiff while talking to her co-worker friends in Hebrew.  From the manner and look of the discussion, Plaintiff knew that she was making derogatory comments.

46.     Continuing her discriminatory campaign, Hazan lodged false complaints to Davis about Plaintiff's work performance.  On many occasions, she falsely accused him of giving customers incorrect information.

**_Plaintiff Complains About the Escalated Harassment_**

47.     On or about August 24, 2011, Plaintiff complained to Modica about Hazan's anti-gay harassment.

48.     In response, Modica held a meeting with Plaintiff and Hazan to discuss Plaintiff's complaint.  The meeting was wholly unproductive, because Hazan screamed at Plaintiff for much of the meeting.

49.     Because Modica did nothing to remedy Hazan's discriminatory behavior, on or about August 25, 2011, Plaintiff complained to Robin Bloom, Assistant Vice President of Human Resources, about Hazan's homophobic behavior.  Bloom took no steps to remedy the situation.

***Plaintiff is Retaliated Against for Complaining About Discrimination***

50.     Shortly after Plaintiff complained, Davis threatened him stating, "eventually you will realize going to HR is not the way to handle things."

51.     Later that day, Davis told Plaintiff that when he started as temporary worker, Tewndolyn Blevins, Assistant Vice President of Loan & LC Operations Department, was upset and asked her why the Bank kept hiring gays.  Davis said that she told Blevins, "[i]t's not like there's a box I can check" to make sure gays are excluded.  This comment, coupled with Davis' comment from earlier in the day, made Plaintiff believe that his job was in jeopardy.

52.     Thereafter, Davis continuously singled-out and criticized Plaintiff in retaliation for him complaining to HR.

53.     In or about September 2011, on the day Davis returned from her vacation, she repeatedly called Plaintiff into her office to reprimand him for making "errors" while she was away.  To each "complaint," Plaintiff provided proof that he had done nothing wrong.  This made Davis increasingly agitated and hostile.

54.     Davis also denied Plaintiff benefits and opportunities available to his heterosexual co-workers.

55.    For example, Davis gave Plaintiff considerably fewer opportunities to work overtime than other employees in the Department, even though overtime was often necessary to complete his assigned tasks. Plaintiff believed he was denied overtime because he is gay, so he complained to Davis and Motto. In response, Davis told him "there can be only one diva" in the Department (referring to herself as the "diva") and that his overtime request would not be met. For his part, Motto did nothing.

56.    Moreover, in or about October 2011, on a day when Davis was absent, Plaintiff called Motto to ask if he could stay home to care for his seriously sick husband, who was suffering from a high fever. The request was denied and Plaintiff came to work. Later that day, Plaintiff became concerned because he was unable to contact his husband, and told Motto that he had to go home to check on him because he is prone to fever seizures.

57.    The following day, Plaintiff learned that Michael's fever returned and asked Davis if he could leave early. Plaintiff expected the request to be granted, because the Bank's sick leave policy permits five personal sick days to care for an immediate family member. Davis denied his request.

58.    Given the dire situation (Michael's dangerously high fever lasted for several days), Plaintiff asked Motto for permission to leave work. Motto consented, and HR notified him that his absence was excused under Bank policy.

59.    Although Motto and HR approved Plaintiff's leave, Davis was enraged that he left work to care for his husband. The following day, Davis was extremely hostile and berated him. Further, she refused to permit him to code his time off as family sick days on his time sheet, as specifically instructed by HR. Rather, she insisted that his days off were unexcused and would be unpaid. Plaintiff knew that this was discriminatory because upon information and belief, just

a month prior, Cardona, who is heterosexual, used five sick days to care for his wife who had the flu.

60.     To further retaliate against Plaintiff, Davis prohibited him from taking his 30-minute lunch break as required under the New York Labor Law.  Rather, she forced Plaintiff to clock-out for 30 minutes a day, to make it appear that he took his lunch break, but then made him work during that time.

61.     Unwilling to accept Davis' conduct, on or about December 30, 2011, at approximately 10:00 a.m., Plaintiff met with Hall regarding Hazan and Davis' continuous harassment and retaliation.

62.     Shortly thereafter, Davis retreated to her office and closed the door, which rarely happened.  Later that day at approximately 3:00 p.m., she emerged and gave Plaintiff a written performance warning in Motto's presence.  Plaintiff knew that the written performance warning was in retaliation for complaining to Hall.

63.     Less than a month after receiving the fabricated warning, on or about January 10, 2012, Plaintiff received his annual performance review.  He received a score of 2.7 (proficient) out of a possible 5.0.  Because he did not agree with the review and knew Davis was trying to force him out, he refused to sign it.  Plaintiff asked Davis why she was trying to get him fired, and she laughed.

64.     Thereafter, on or about January 13, 2012, Plaintiff met with Motto to complain that his December 2011 write-up and negative January 2012 performance review were discriminatory and in retaliation for him complaining to HR about discrimination.  Motto raised his performance review score to 3.35 and advised him to speak to Modica about Davis' behavior.

65.     As instructed, Plaintiff complained to Modica about Davis' behavior.  Plaintiff expressed that he just wanted to be treated like everyone else and did not feel comfortable with her supervising him.  He explained that he was willing to do whatever it took to resolve the situation.  Modica agreed that Davis' behavior was inappropriate.

*Disability Discrimination and Family and Medical Leave Act Violations*

66.     On or about May 2, 2012, Plaintiff's husband was admitted to the hospital.  That evening, Plaintiff learned that his husband was suffering from pneumocystis pneumonia, a pneumonia associated with the acquired immune deficiency syndrome ("AIDS").

67.     Several days later, on or about May 7, 2012, Plaintiff tested positive for HIV.

68.     After learning of his diagnosis, Plaintiff informed Modica that he needed time off to address his serious health issues, explaining that he was diagnosed with HIV and his husband was diagnosed with AIDS.  Modica's only response was to ask, "why haven't you guys been tested before?"  Plaintiff was shocked and offended by the crass comment.

69.     Thereafter, Modica advised Plaintiff to notify HR.  Plaintiff expressed that he was uncomfortable discussing his personal medical crisis with Hall because of her negative attitude towards him in the past for complaining about discrimination, and Modica advised him to meet with Bloom when she returned from vacation the next week.

70.     When Bloom returned, Plaintiff notified her of his HIV status.  Bloom advised him to take FMLA leave.

71.     Plaintiff was on an approved FMLA leave from May 2, 2012 to May 18, 2012, and on May 23, 2012.  While on FMLA leave, Modica told him the Deposit Services Department was splitting, and when he returned from leave he would work in the money transfer room

supervised by Fried, Vice President of Money Transfer/Cash Management Services.   She explained that Plaintiff's new direct supervisor would be Cardona.

72.    Plaintiff returned from leave, despite terrible side effects from his new medication.  Upon his return, he immediately notified Cardona that Michael suffered from AIDS, and that he (Plaintiff) was being treated for an HIV-related illness.  Plaintiff also explained that his body was adjusting to his HIV medication and because of this, he suffered from severe side effects and had to have blood drawn on a bi-weekly basis.

73.    In or about late May 2012, Plaintiff notified Cardona that he had a doctor's appointment on June 1, 2012 to seek treatment for his HIV and would arrive at work by noon. Cardona approved this.

74.    On or about June 1, 2012, Plaintiff arrived at work after his appointment and submitted his FMLA physician certification to HR.  Later that day, Davis reprimanded him for being late to work, even though she was no longer his supervisor.  When Plaintiff reminded her that she no longer supervised him, she verbally attacked him.[1]

75.    Throughout June 2012, Davis and Hazan's abusive behavior continued.  Although Davis was no longer his supervisor, on many days she interrupted his work as often as four times an hour to deal with issues that were not part of his new position.  In addition, Hazan yelled at him, called him stupid, and warned other employees to not work with him.  Foster told Plaintiff that when he was on FMLA leave, Davis and Hazan would go through his desk to look for anything that could be construed as an error.

---

[1] Davis claimed that Plaintiff's mother made a "commotion" when she visited him at work and then made a "rule" that all future visitors must speak to him only in the break room. No other employee's guests were sent to the break room.

76.     Again, Plaintiff complained to Hall. He protested the discrimination and said that if it did not stop, he would complain to the Bank's legal department. Hall assured him that he no longer worked for Davis and should only accept work assignments from Cardona and Fried.

77.     Several days later, Modica, contrary to Hall's statements, told him that he still reported to Davis until his desk was physically moved to the new location, adding, "no one could tell [her] how to run [her] department."

78.     Plaintiff expressed that he was confused about whom he reported to and could not handle Davis' anti-gay harassment. He explained that the stress made it difficult for his health to improve. Modica accused Plaintiff of using his health condition "to get whatever he wanted."

79.     On or about June 21, 2012, Plaintiff packed up his desk contents to move to the money transfer room. Seeing this, Foster proclaimed that she was afraid of "catching AIDS" from his dirty desk "because that shit's going around" and asked for some Lysol (to kill the AIDS' germs). Plaintiff was extremely offended by this ignorant and discriminatory comment, and told Foster that she was being ridiculous.

80.     About a month later, in or about July 2012, Foster told Plaintiff that "after AIDS came out, people stopped getting raped" because the rapists were afraid of catching AIDS. Based on these comments, Plaintiff believed that the Bank told employees of his medical condition.

81.     Thereafter, Plaintiff's desk was moved into the money transfer room (behind a glass window), and some employees refused to enter the room for fear of being next to the gay guy and/or catching AIDS. For example, when Gabi Hamani (Senior Executive Vice President) toured the Bank each month, he would not enter the money transfer room if Plaintiff was inside. Steven Servidio (Assistant Vice President, Money Transfers) acknowledged that Hamani's

behavior was strange because in the past, he had entered the room to check-in with each employee.

82.    Plaintiff continued to suffer debilitating side effects from HIV and his medication. He notified Cardona of his deteriorating health, and took FMLA leave on or about June 27, 2012 and June 28, 2012.

83.    On or about June 29, 2012, Plaintiff returned to work.  Upon his return, Fried stated, "I have big plans for you, but I heard you came in late once and were out two days."  He demanded that Plaintiff be "more reliable."

84.    Plaintiff responded that he was out because of a serious medical condition covered by the FMLA and it would probably take some time for him to get healthier.  He informed Fried that HR and Modica were aware of the specifics.  Although Fried was aware that Plaintiff's absences were covered by the FMLA, he warned Plaintiff to "get better quickly."

85.    On or about August 1, 2012, Plaintiff was out on approved FMLA leave.  He told Cardona that he was out due to side effects caused by his HIV medication.

86.    The next day, on or about August 2, 2012, Plaintiff was told to meet with Fried and Bloom.  At this meeting, Fried, referencing their June 29, 2012 meeting, told Plaintiff that he was fired because he "missed too much work."

87.    Bloom, who seemed surprised that Fried would actually state that Plaintiff was being fired for taking legally protected absences, added that he was also being fired because his time sheets were three weeks late.  Plaintiff knew that Bloom's reason was pretextual, because in the past, his co-workers did not complete their timesheets in a timely matter and they were not fired.

88.     Plaintiff was shocked and stated that he could not believe that the Bank was firing him because of his health condition.

## FIRST CAUSE OF ACTION

### FMLA – Interference

#### *As Against the Bank, Davis, and Fried*

89.     Plaintiff realleges and incorporates by reference paragraphs 1 through 88 of the Complaint as if fully set forth herein.

90.     By the aforementioned actions, the Bank, Davis and Fried, separately and together, have interfered with, restrained and denied Plaintiff his rights under the FMLA, in violation of 29 U.S.C. §§ 2612(a), 2614(a) and 2615(a).

91.     As a result of the violation of the FMLA, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, and loss of opportunity for advancement and promotion.

## SECOND CAUSE OF ACTION

### FMLA – Retaliation

#### *As Against the Bank, Davis, and Fried*

92.     Plaintiff realleges and incorporates by reference paragraphs 1 through 91 of the Complaint as if fully set forth herein.

93.     By the aforementioned actions, the Bank, Davis and Fried, separately and together, have retaliated against Plaintiff for exercising his rights under the FMLA, in violation of 29 U.S.C. § 2615(a).

94.     As a result of the retaliation, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, and loss of opportunity for advancement and promotion.

## THIRD CAUSE OF ACTION

### Disability Discrimination (Actual and Perceived)

### *As Against the Bank, Davis, Fried, and Hazan*

95.     Plaintiff realleges and incorporates by reference paragraphs 1 through 94 of the Complaint as if fully set forth herein.

96.     At the time of his termination, Plaintiff was a qualified individual with an actual or perceived disability as defined by the Human Rights Law § 292(21) and City Law § 8-102(16), who was able to perform the essential functions of his position with or without reasonable accommodation.

97.     Defendants regarded and/or perceived Plaintiff as disabled (as defined by the Human Rights Law § 292(21) and City Law § 8-102(16)(a)) by virtue of his medical condition as alleged above.

98.     Defendants terminated Plaintiff because of his actual or perceived disability.

99.     Plaintiff was qualified to (and did) perform the essential functions of his position, with or without reasonable accommodation.

100.    By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of his employment, on the basis of his actual or perceived disability, in violation of the Human Rights Law §§ 296(1) and 6 and City Law §§ 8-107(1) and (6).

18

101.    As a result of the discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation, and damage to reputation and career.

## FOURTH CAUSE OF ACTION

### *As Against the Bank, Davis, Fried, and Hazan*

### Sexual Orientation Discrimination (Actual and Perceived)

102.    Plaintiff realleges and incorporates by reference paragraphs 1 through 101 of the Complaint as if fully alleged herein.

103.    By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of his employment, on the basis of his sexual orientation, in violation of the Human Rights Law § 296(1) and the City Law § 8-107(1).

104.    As a result of the discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, and humiliation.

## FIFTH CAUSE OF ACTION

### Aiding and Abetting Disability and Sexual Orientation Discrimination
### *As Against the Bank, Davis, Fried, and Hazan*

105.    Plaintiff realleges and incorporates by reference paragraphs 1 through 104 of the Complaint as if fully set forth herein.

106.    Plaintiff was terminated because of his disability and/or sexual orientation.

107.     By the aforementioned actions, each of the Defendants, separately and together, have aided and abetted discrimination against Plaintiff in the terms, conditions, and privileges of his employment, on the basis of his disability and/or sexual orientation, in violation of the Human Rights Law § 296(6) and City Law § 8-107(6).

108.     As a result of the aiding and abetting engaged in by each of the Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation, and damage to reputation and career.

## SIXTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### *As Against the Bank, Davis, Fried, and Hazan*

109.     Plaintiff realleges and incorporates by reference paragraphs 1 through 108 of the Complaint as if fully set forth herein.

110.     By Defendants' extreme and outrageous conduct, which included immediately firing him after he returned from his leave for a serious health condition and blatant discrimination against him during the course of his employment, Defendants, separately and together, intended to cause and did cause, severe emotional distress to Plaintiff.

111.     Plaintiff has suffered, and continues to suffer, severe emotional harm, loss, injury, and damage as a result of Defendants' conduct.

**WHEREFORE**, Plaintiff demands that judgment be entered in his favor and that the Court order and award Plaintiff the following relief against Defendants:

A.      Damages in the form of (i) back pay with interest based on Plaintiff's appropriate compensation had his rights under the FMLA not been violated and had he not been discriminated against; and (ii) front pay;

B.      Compensatory damages for his emotional pain and suffering, mental anguish, distress, humiliation, and loss of reputation in an amount to be determined at trial;

C.      Punitive damages in an amount to be determined at trial;

D.      Liquidated damages pursuant to 29 U.S.C § 2617(a)(1)(A)(iii);

E.      Attorneys' fees;

F.      Costs and disbursements;

G.      Interest; and

H.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury as to all issues in the above matter.

Dated: June 20, 2013
New York, New York

Respectfully submitted,
CARABBA LAW FIRM P.C.

By: _____
        Anthony Carabba, Jr.

85 Worth Street, Third Floor
New York, New York 10013
212.430.6400 (p)
212.430.6405 (f)

*Attorneys for Plaintiff*